UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

LIBERTARIAN PARTY            )
OF MAINE, INC.,  et al.,     )
                             )
         Plaintiffs,     )
                             )
        v.               )        2:16-cv-00002-JAW
                             )
MATTHEW DUNLAP, et al.,      )
                             )
        Defendants.      )

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

In this election law case, in December 2015, the Secretary of State for the state of Maine rejected the Libertarian Party of Maine, Inc.'s attempt to qualify as a recognized political party, and the Libertarian Party is now seeking to force the Secretary to reopen the qualification process to allow it to gather additional party enrollees and then to participate in the upcoming primary and general elections.  The Court denies the Libertarian Party's request for injunctive relief on practical grounds, namely that the requested relief would send the election process into chaos.  The Court does not reach the merits of the underlying declaratory judgment action.

## I.     PROCEDURAL BACKGROUND

On January 4, 2016, the Plaintiffs, the Libertarian Party of Maine, Inc. and several individuals affiliated with the Libertarian Party, filed a complaint against Matthew Dunlap, the Secretary of State for the state of Maine (Secretary Dunlap); Julia Flynn, the Deputy Secretary of State for the state of Maine (Deputy Flynn); Tracy Willet, the Assistant Director, Division of Elections, state of Maine (Assistant

Director Willet); and the Maine Department of the Secretary of State (the Department or the Secretary), seeking a declaratory judgment and an injunction concerning the Defendants' actions and omissions regarding the attempts of the Libertarian Party and its members to participate in Maine's June 2016 primary election. *Compl. for Declaratory & Injunctive Relief* (ECF No. 1) (*Compl.*). On March 8, 2016, the Defendants filed an answer to Plaintiffs' Complaint. *Defs.' Ans. to Pls.' Compl.* (ECF No. 17).

On January 27, 2016, the Plaintiffs filed an emergency motion for preliminary injunction, a request for oral argument, and a supporting memorandum. *Pls.' Emer. Mot. for a Prelim. Inj.* (ECF No. 8) (*Pls.' Mot.*); *Id.* Attach. 1 (*Mem. of Law in Supp. of Pls.' Emer. Mot. for Prelim. Inj.*) (*Pls.' Mem.*). On February 17, 2016, the Defendants filed their opposition. *Defs.' Mem. in Opp'n to Pls.' Mot. for Prelim. Inj.* (ECF No. 14) (*Defs.' Opp'n*). On March 9, 2016, the Plaintiffs filed a reply to the Defendants' opposition. *Reply Mem. in Supp. of Pls.' Emer. Mot. for Prelim. Inj.* (ECF No. 19). On February 16, 2016, the Court granted the Plaintiffs' motion for oral argument. *Order Granting Mot. for Oral Arg./Hr'g* (ECF No. 12). On March 31, 2016, the Court held oral argument, which included the presentation of testimonial evidence, *Min. Entry* (ECF No. 24), and which broke for the day then resumed and concluded on April 5, 2016. *Min. Entry* (ECF No. 26)

## II. THE FACTUAL ALLEGATIONS IN THE COMPLAINT

### A. The Parties

The Plaintiff Libertarian Party of Maine, Inc. (Maine Libertarian Party) describes itself as a nonprofit corporation with a principal place of business in Brunswick, Maine, established in 1998 for the principal purpose of promoting and implementing libertarian ideas and principles, by, among other things, forming a libertarian political party in Maine, promoting the election of libertarian candidates for public office in Maine and more meaningful electoral choices for Maine voters, working for the election of the national Libertarian Party nominee for President and Vice President, conducting informational and educational activities, and supporting or opposing referenda and ballot initiatives. *Compl.* ¶ 1. The Libertarian Party says it is affiliated with the national Libertarian Party, the third largest political party organization in the United States. *Id.*

Several individuals associated with the Maine Libertarian Party are also included as Plaintiffs: Jorge Maderal, a Brunswick, Maine resident, who is President and Chair of the Maine Libertarian Party and a member of the national Libertarian Party; Susan Poulin, a resident of Casco, Maine, Secretary of the Maine Libertarian Party; Shawn Levasseur, a resident of Rockland, Maine, Treasurer of the Maine Libertarian Party; Christopher Lyons, a resident of Brunswick, Maine, a member of the Maine and national Libertarian parties; Eric Grant, a resident of Biddeford, Maine and a member of the Maine and national Libertarian parties; and Charles Jacques, a resident of Brunswick, Maine and a member of the Maine and national Libertarian parties. *Id.* ¶¶ 2-7. Each individual Plaintiff has expressed the intention to form the Libertarian Party of Maine pursuant to a process established under Maine

3

law.  *Id.*  The Defendants have each been impleaded in his, her, or its official capacity.  *Id.* ¶¶ 9-12.

### B.     Jurisdiction and Venue

The Plaintiffs assert that this Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because their claims arise under the First and Fourteenth Amendments of the United States Constitution and under 42 U.S.C. § 1983.  *Id.* ¶ 15. They say that venue is appropriate because all the individual Plaintiffs are residents of Maine, the Maine Libertarian Party is a Maine nonprofit corporation, and all the Defendants are located and maintain their offices in Maine.  *Id.* ¶ 13.  They state that the Court has personal jurisdiction over the Defendants because they are Maine state governmental officials and a Maine state governmental agency.  *Id.* ¶ 14.

### C.     Facts Common to All Counts

#### 1.     Maine's Statutory Scheme for Political Parties and Elections

The Plaintiffs allege that in 2013 the Maine Legislature enacted an amendment to Maine's election laws that required political parties not yet officially recognized by the state of Maine to enroll at least 5,000 voters during the year before a general election as a condition for participating in the following year's primary elections.  *Id.* ¶ 17 (citing 21-A M.R.S. § 303).  According to the Plaintiffs, under the new law, citizens seeking to form a political party must certify their enrollment of the minimum number of voters no later than December 1st of the year before the general election, more than six months before the primary election and more than eleven months before the general election.  *Id.*  The Plaintiffs say that with the sole exception

of the office of President of the United States, the primary election is the exclusive gateway to participation in Maine's general election for all political parties, major and minor alike. *Id.* ¶ 18 (citing 21-A M.R.S. § 331). They assert that unlike other states, Maine does not allow minor political parties to nominate candidates for federal, state, or local office by holding a party convention. *Id.*

### 2.      Plaintiffs' Effort to Qualify for Electoral Participation

The Plaintiffs state that in December 2014, they along with other registered Maine voters formally declared their intent to form the "Libertarian Party of Maine" by enrollment pursuant to 21-A M.R.S. § 303. *Id.* ¶ 21. They allege that on December 22, 2014 and December 29, 2014, they filed two fully executed declarations with the Secretary of State containing the names of ten Maine voters not yet enrolled in a qualified party. *Id.* They state that from January 1, 2015 through November 30, 2015, they procured the enrollment of 6,482 Maine voters representing 356 different Maine towns and cities in the Maine Libertarian Party and submitted valid forms to the Secretary of State and to local election officials. *Id.* ¶ 22.

On December 1, 2015, the Plaintiffs claim that Mr. Maderal filed a certificate with the Secretary of State pursuant to 21-A M.R.S. § 303(2) stating that the Libertarian Party of Maine had enrolled at least 5,000 Maine voters, and under the statute, the Secretary of State had five business days—until December 8, 2015—to verify the total number of enrollments and notify the Plaintiffs whether the Libertarian Party had met the requirements to participate in Maine's 2016 primary election. *Id.* ¶ 23. They allege that at a meeting with Deputy Flynn and her assistant,

Melissa Packard, at the Department's office in Augusta on December 8, 2015, Mr. Maderal was told that the unofficial "verified" number of Maine voters was 4,489, below the 5,000 threshold.  *Id.* ¶ 24.  The Plaintiffs say that the Secretary of State's verification process contained a number of discrepancies and concerns, including an unusually high rejection/failure rate for the enrollments, 31% of all enrollments submitted.  *Id.* ¶ 25.  As a consequence, the Plaintiffs contend that on December 14, 2015, the Maine Libertarian Party asked the Secretary of State to extend the verification process under 21-A M.R.S. § 303(2) to allow the Secretary of State and the Maine Libertarian Party an opportunity to investigate and remedy the high rejection/failure rate.  *Id.* ¶ 26.

### 3.    Disqualification of the Libertarian Party and its Members

The Plaintiffs maintain that on December 18, 2015, the Maine Libertarian Party received a letter from Deputy Flynn announcing that the Secretary was able to verify only 4,513 enrollments in the Libertarian Party of Maine, falling short of the 5,000 required to form a new political party and participate in the 2016 primary election.  *Id.* ¶ 27.  Although Deputy Flynn indicated in the letter that the Department had been able to verify a number of additional Libertarian Party enrollees after the December 8, 2015 meeting between Deputy Flynn and Mr. Maderal, the Department did not have sufficient time to follow up with all 356 cities and towns across the state of Maine that received enrollment applications.  *Id.*  The Plaintiffs say that except for the office of the Presidency of the United States, the Secretary's December 18th determination meant that the individual Plaintiffs and

others would be disqualified from nominating, voting for, otherwise supporting, or running as a Libertarian Party candidate for federal, state, or local office in Maine's 2016 primary and general elections. *Id.* ¶ 28.

The Plaintiffs also claim that in her December 18th letter, Deputy Flynn further notified the Maine Libertarian Party that all Maine voters enrolled in the Libertarian Party would be "unenrolled" and that the Department would inform municipal officials that the Libertarian Party is no longer an "acceptable" enrollment option. *Id.* ¶ 29. The Plaintiffs say that Deputy Flynn denied the Maine Libertarian Party's request that it be given additional time to allow more enrollments to be processed and verified and to address any irregularities and wrongfully rejected enrollments, stating in part that the governing statute, 21-A M.R.S. § 303, did not allow such an extension. *Id.* In addition, the Plaintiffs allege that they were not afforded the opportunity for an administrative hearing before the Secretary's decision disqualifying the Libertarian Party from participating in the 2016 primary election and nullifying its enrollment status. *Id.* ¶ 30.

The Plaintiffs assert on information and belief that the Defendants failed to deliver to local election officials in a timely and expeditious manner all voter and enrollment forms that the Plaintiffs submitted to the Department from January 1, 2015 through mid-October 2015. *Id.* ¶ 31. As a result, they claim, the local election officials were unable or failed to complete the form processing so that they could verify the total number of Maine Libertarian Party enrollments within the five-day deadline under 21-A M.R.S. § 303(2). *Id.* The Plaintiffs also allege that the municipal officials

7

improperly invalidated or failed to process more than one thousand voter registration and enrollment forms that should have resulted in the successful enrollments in the Maine Libertarian Party.  *Id.* ¶ 32.

On December 22, 2015, the Plaintiffs claim, Assistant Director Willet sent a memorandum to all municipal registrars and clerks throughout the state of Maine announcing that the Libertarian Party of Maine had failed to qualify as a political party eligible to participate in the 2016 primary election.  *Id.* ¶ 33.  She also informed all local election officials that the Department had (a) removed the Libertarian Party as an enrollment choice in the Central Voter Registration (CVR) database, and (b) changed the enrollment status of all voters enrolled in the Libertarian Party to "unenrolled."  *Id.*  The Plaintiffs say that Assistant Director Willet further instructed the municipal officials to designate as "Unenrolled" any voters who submit applications requesting enrollment in the Libertarian Party.  *Id.*

## III.   THE PARTIES' POSITIONS

### A.   The Plaintiffs' Motion

#### 1.   An Overview

In late December 2014, the Plaintiffs "embarked upon the difficult task of qualifying as an officially recognized political party under a rigid and burdensome set of regulations enacted by the Maine legislature in 2013."  *Pls.' Mem.* at 3.  After quoting subsections one and two of Maine's law governing new party formation, the Plaintiffs maintain that the statute "impermissibly burdens the First and Fourteenth amendment rights of minor political parties and their members."  *Id.* at 4.  First, the

Plaintiffs say that the law "establishes an exceptionally early deadline too far in advance of the primary election." *Id.* The Plaintiffs contend that the law in effect "requires that all 5000 party enrollments be collected during an off year when the public is most disengaged from the political process." *Id.* Next, the Plaintiffs allege that the law "fails to allow sufficient time for the verification of enrollment figures, and provides no mechanism for challenging the rejection of individual enrollments." *Id.* Third, the Plaintiffs argue that the law "fails to provide applicants with adequate notice of the precise requirements for party qualification." *Id.* Fourth, the Plaintiffs maintain that the law "places greater burdens on minor political parties and their members than it does on the two major political parties and their members." *Id.* Fifth, the Plaintiffs assert that "Maine's statutory scheme does not provide any reasonable alternative methods for minor parties to nominate candidates and participate in elections." Finally, the Plaintiffs contend that "the burdens imposed on the rights of minor parties and their members are not necessary to further any compelling or legitimate state interest." *Id.*

The Plaintiffs note that the statute requires minor political parties to declare an intent to form a party in the last month of an even-numbered year. *Id.* (citing 21-A M.R.S. § 303(1)). This provision has the effect, they say, of requiring the minor party to collect signatures during the following odd year, when public attention to and enthusiasm about the political process is historically lowest. *Id.* Then no later than December 1 of the odd year, more than six months before the primary and more than eleven months before the general election, the applicants are required to certify

to the Secretary that they have enrolled at least 5,000 voters in their political party. *Id.* at 4-5. The statute then affords the Secretary only five days to verify the number of valid enrollments, a timeframe the Plaintiffs contend is "particularly narrow," considering the fact that all voter registration and change of enrollment forms are received and processed by the individual towns and cities across the state and not by the Secretary. *Id.* at 5.

Moreover, the Plaintiffs complain that the Maine statute is the "exclusive" means for political parties—other than the two major parties—to nominate and select candidates for federal, state, and local office with the sole exception of the Presidency. *Id.* The Plaintiffs say that even though Presidential candidates are not nominated by primary election in Maine, only those political parties deemed "qualified" to participate in the primary election are allowed to secure a place for their presidential candidates on the general election ballot by communicating to the Secretary the name of their candidate duly selected at their party convention. *Id.* The Plaintiffs observe that unlike the vast majority of states, Maine does not allow minor political parties to nominate candidates by convention or petition. *Id.* at 6. In short, the Plaintiffs say that the Maine statute effectively precludes minor parties "from participation in Maine's elections and deprive[s] [them] of the litany of other benefits accorded to qualified political parties under Maine law." *Id.*

### 2.    The Standard for Granting a Preliminary Injunction

The Plaintiffs recite the familiar standards that govern a court's decision whether to grant a motion for preliminary injunction: "(1) a substantial likelihood of

success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *Id.* at 11 (quoting *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003) (citing *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001)). The Plaintiffs address each standard in turn.

### a.   Likelihood of Success

The Plaintiffs first articulate the high standard under which the validity of election laws must be judged when they impinge on the exercise of constitutional freedoms. *Id.* at 12-14. The Plaintiffs assert that the Maine election laws violate their rights of free expression and association in contravention of the First and Fourteenth Amendments. *Id.* at 14. They also say that the current statutory scheme deprives individuals of their right to vote. *Id.* at 15. They maintain that the Maine law imposes severe, unreasonable, and unnecessary burdens on their exercise of constitutional rights. *Id.* at 12-16.

Specifically, regarding the December 1 deadline under 21-A M.R.S. § 303(2), the Plaintiffs contend that it is unreasonable because it is too early. *Id.* at 16-17. Citing cases, they claim that courts in no fewer than ten jurisdictions have struck down as too early deadlines substantially "*less early*" than the Maine deadline. *Id.* at 17 (emphasis in original); *id.* n.11 (collecting cases). Next, they say that the December 1 deadline requires the minor party to recruit supporters during the off-year, and courts have also struck down similar measures on this basis. *Id.* at 18-20. Third, they argue that because the two major parties are perpetually qualified under Maine

law, the burden of early party qualification falls unequally and unfairly on minor parties and their supporters. *Id.* at 20-21. The Plaintiffs finally contend that the early deadline impinges on the exercise of constitutional rights in a fashion not justified by any legitimate governmental interest. *Id.* at 21-22.

The Plaintiffs turn to the five-day verification deadline in 21-A M.R.S. § 303(2). *Id.* at 23-27. Under this law, they say the Secretary has only five business days from the date the prospective political party declares the enrollment of at least 5,000 voters to verify the total number of enrollees in that party. *Id.* at 23. The Plaintiffs contend that this five-day limit unduly constrains the Secretary, the Department, and the local officials from completing their respective statutory duties. *Id.* at 23. In fact, they assert that the circumstances of the handling of their enrollment declaration demonstrate that the timeframe for review by state and local officials is too short for the officials to complete proper verification. *Id.* at 23-24. They also complain that the statute does not provide any mechanism for contesting rejected enrollments or for correcting technical deficiencies in the enrollment declaration. *Id.* at 24. They conclude that the five-day verification deadline places a severe burden on the Plaintiffs' exercise of their First and Fourteenth Amendment rights unjustified by any compelling or legitimate state interest. *Id.* at 24-25.

### b.   **Irreparable Harm**

The Plaintiffs argue that they will suffer irreparable harm from the denial of their motion for preliminary injunction because they will be denied the right to nominate and place party candidates on the Maine ballot for the 2016 primary and

general elections. *Id.* at 27-28. They reiterate that they will lose their First and Fourteenth Amendment freedoms. *Id.*

### c.  Balance of Hardships and Lack of Friction

The Plaintiffs foresee no significant burden on the Defendants that outweigh the loss of their political rights and constitutional freedoms. *Id.* at 29-30. Moreover, they maintain that there is no friction between the requested injunctive relief and the public interest because the Maine Libertarian Party's presence on the ballot will protect diversity and competition in the marketplace of ideas. *Id.* at 29-30.

### B.  The Defendants' Response

### 1.  An Overview

The Defendants maintain that the Plaintiffs are seeking to judicially reverse the consequences of their own failure to meet the statutory deadline to enroll 5,000 voters in the Maine Libertarian Party in order to qualify as a recognized party in this election cycle. *Defs.' Opp'n* at 1. The Defendants emphasize that in order to qualify as a recognized party, the Maine Libertarian Party had twelve months before December 1, 2015 in order to show "basic level of support"—one half of one percent of Maine registered voters or 5,000 enrolled members. *Id.* at 2. The Defendants say that the Maine Libertarian Party, not the statute, is responsible for its failure to qualify. *Id.*

Citing 21-A M.R.S. § 302(1) and 303(1), the Defendants say that the Maine statute provides two routes to form a qualified party authorized to nominate candidates for federal, state, and county offices through a primary election. *Id.* They

13

say that the Plaintiffs chose the so-called "organization by party enrollment" route. *Id.* They describe the step-by-step process the Plaintiffs must follow:

(1)     ten registered and unenrolled voters must file a Declaration of Intent with the Secretary between December 1 and December 30 of any even-numbered year;

(2)     the Secretary must certify within five business days whether the applicant has satisfied the ten unenrolled voter requirement;

(3)     once certified, the applicants may begin enrolling voters;

(4)     under Maine policy, an applicant may receive up to 5,000 free voter registration cards to enroll voters;

(5)     voter applications to register and/or enroll in a proposed new party are processed at the local level by municipal registrars and clerks;

(6)     if the voter card has been properly completed, the registrar enters the new party enrollment in the voter's record in the Central Voter Registration System (CVR), a statewide database;

(7)     on or before December 1 of the odd-numbered year following the year in which a Letter of Intent is filed, the applicant must file a form with the Secretary certifying that it has enrolled at least 5,000 members;

(8)     the Secretary has five business days from the filing of the form to determine if the applicant has met the threshold and inform the applicant; and

(9)    if the party fails to qualify, the voters who had enrolled are

deemed "unenrolled."

*Id.* at 2-4.

The Defendants present a separate version of the Maine Libertarian Party's attempts to comply with these steps.  They acknowledge that the Maine Libertarian Party fulfilled steps one through three: (1) ten registered voters filed a Declaration of Intent to Form a Party by Party Enrollment with the Secretary's office on December 22, 2014; (2) on January 6, 2015, the Secretary informed Mr. Maderal that the Maine Libertarian Party could begin to enroll voters;[1] and (3) the Maine Libertarian Party began to do so.  *Id.* at 3.

Under Maine policy, an applicant may receive up to 5,000 free voter registration cards to enroll voters, and according to the Defendants, the Secretary provided Mr. Maderal with a copy of the policy.  *Id.*  The Defendants say that during the month of May 2015, they provided the Maine Libertarian Party with 4,000 voter registration forms along with a set of instructions.  *Id.*  The Secretary states that it provided Mr. Maderal with another 1,000 cards between July 2 and August 7, 2015. *Id.*  In effect, the Defendants aver that the Secretary complied with step four.

In steps five and six, the applicant brings new voter registrations to the applicable municipal registrar or clerk, and the municipal official enters the new party enrollment in the CVR.  *Id.* at 3-4.  During the first six months of 2015, the

---

[1]    The Secretary says that the original Declaration of Intent filed on December 22, 2014 was defective because two of the ten registered voters were ineligible as already being enrolled in a qualified party.  *Defs.' Opp'n* at 3.  But the group filed another form on December 29, 2014, which—when combined with the original filing—satisfied the requirement.  *Id.*

CVR data, according to the Defendants, showed that the Maine Libertarian Party succeeded in enrolling only 246 voters in its party.  *Id.* at 4.

In step seven, the applicant must submit a signed certificate by December 1, certifying that the party enrolled the requisite number of voters.  On December 1, 2015, the Defendants admit that Mr. Maderal submitted a signed certificate, stating that the Maine Libertarian Party had enrolled at least 5,000 voters.  *Id.* at 5.  But the Secretary checked the CVR and discovered that only 4,248 voters had actually been enrolled in the Maine Libertarian Party.  *Id.*  The Defendants say that Ms. Packard informed Mr. Maderal of this fact by email the afternoon of December 1, 2015 and transmitted an electronic copy of the "Enrolled and Registered" report from CVR.  *Id.*

The Defendants say that Mr. Maderal responded that officials in the city of Lewiston, Maine had not entered all the registration and enrollment applications into the CVR apparently due to an upcoming run-off election for Mayor scheduled for December 8, 2015.  *Id.*  In addition, Mr. Maderal noted a discrepancy between his tally of the number of enrollment applications the Maine Libertarian Party had submitted to twenty-three different towns and the number of verified enrollments. *Id.*  He asked the Secretary to investigate the disparity.  *Id.*

The Secretary says that its staff checked with Lewiston and other larger cities and towns on Mr. Maderal's list to determine whether any enrollment applications received on or before December 1, 2015 were still pending.  *Id.*  Both Lewiston and Auburn acknowledged that they had not yet processed a number of timely filed

16

enrollment applications and that there were a number of timely filed but not accepted applicants' change-in-party registrations because of a fifteen-day waiting period. *Id.* at 5-6 (citing 21-A M.R.S. § 144(2)). The Defendants say the Secretary agreed to count all of these voters in the waiting period toward the threshold. *Id.* at 6. As of December 8, 2015, the CVR still showed only 4,489 enrollees. *Id.* By December 18, 2015, after Lewiston and Auburn had finished processing, the number of Maine Libertarian Party enrollees as of December 1, 2015 was still too low: 4,513. *Id.* On December 18, 2015, Deputy Flynn emailed Mr. Maderal the Secretary's determination that the Maine Libertarian Party had failed to meet the threshold party registration requirement. *Id.* On December 22, 2015, the Secretary notified municipal registrars and clerks that the Libertarian Party was no longer an acceptable enrollment option. *Id.* The Defendants say that the Plaintiffs failed at steps seven and eight.

### a.    Likelihood of Success

The Defendants agree that the so-called *Anderson-Burdick*[2] test applies to balance constitutional rights against state regulation of elections. *Id.* at 8-9. The Defendants point out that this Court has already determined that ballot access requirements for non-party candidates are not severe and that the First Circuit has upheld elements of Maine's party qualification requirements as not unduly burdensome. *Id.* at 9 (citing *Libertarian Party of Me. v. Diamond*, 992 F.2d 365 (1st Cir. 1993); *Libertarian Party of Me. v. Dunlap*, 659 F. Supp. 2d 215 (D. Me. 2009)).

---

[2]    *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*. 504 U.S. 428 (1992).

The Defendants dispute the Plaintiffs' claim that the December 1 deadline is a severe burden, arguing that "a calendar date is meaningless." *Id.* at 10. Instead, they contend that the Court must "look at the combined effect of all the relevant provisions in a state's election law as well as the factual context." *Id.* First, they argue that the 5,000 enrolled voter requirement based on .5% of Maine's registered voters is modest, substantially lower than the requirement in the past, and less than the bounds approved by other courts. *Id.* at 10-11 (collecting cases). Second, they point out that the Maine statutory scheme gives the political organization "*a full calendar year*" to obtain the required signatures and that the Maine Libertarian Party did not start enrolling voters until May 2015. *Id.* at 12 (emphasis in original). Third, they say that Maine provides an alternative means to gain ballot access by allowing "like-minded candidates [to] gain access to the general election ballot, where they can be listed with the political designation 'Libertarian' or 'Libertarian Party.'" *Id.* at 13-14.

Turning to the reasonableness and nondiscriminatory nature of Maine's regulatory framework, the Defendants note that other political parties, including Americans Elect and the Green Independent Party, have both qualified in Maine. *Id.* at 15. Indeed, the Defendants observe that the Maine Libertarian Party has gained and lost party status over the past decade, but its presidential and vice presidential candidates have qualified for the general election ballot in four out of the past five presidential elections. *Id.* at 15-16. Citing the requirements for continued party

registration, the Defendants reject the Plaintiffs' contention that Maine's requirements fall unequally on minor parties. *Id.* at 16.

As regards the December 1 deadline, the Defendants claim that it is justified by several important state interests. *Id.* The most important is that any candidate who belongs to a qualified party must collect signatures on nomination petitions between January 1 and March 15 of the election year. *Id.* at 16-17. The March 15 date is necessary to allow the candidates to challenge the validity of the petitions for primary nomination. *Id.* at 17. It is also necessary, according to the Defendants, to allow the Secretary to print the multiple ballots necessary to present candidates in each election district. *Id.* They maintain that the state of Maine has an interest in ensuring that a political party possesses a basic level of support among the electorate, *id.* at 17-18, and they argue that the same applies to a party's candidates. *Id.* at 18.

The Defendants next respond to the challenge to the five-business day verification period. *Id.* at 19-26. They first contend that the enrollment process is not complicated and can easily be verified within the five-business days provided. *Id.* at 20-21. Regarding the Plaintiffs' claim that the Defendants were unable to respond to their complaints about the accuracy of the tally, the Plaintiffs note that they contacted the cities the Plaintiffs listed and allowed additional time to verify the information, adding a number of voters after the deadline. *Id.* Finally, the Defendants point out that the statute allows the Plaintiffs to file before December 1 and thereby ease any time constraints that flow from filing on the last possible date. *Id.* at 21-22.

### b.   Irreparable Harm

The Defendants next address the Plaintiffs' irreparable harm arguments. *Id.* at 22-23. They write that "[t]he first alleged harm is insubstantial, the second is speculative, and the third is non-existent." *Id.* at 22. As for the first harm, the inability to secure a place for the Libertarian Presidential and Vice-Presidential candidates in the same manner as the two major parties, the Defendants assert that the First Circuit has held that the alternative route of submitting petitions with signatures of 4,000 Maine voters on or before August 1 of the election year is not substantially more burdensome. *Id.* (citing *Diamond*, 992 F.2d at 374-75). The Defendants are unimpressed with the "single candidate" issue, noting that although it is theoretically possible more than one candidate will self-identify as Libertarian, the Plaintiffs have failed to demonstrate that this possibility is realistic. *Id.* at 23. Finally, the Defendants reject the Plaintiffs' contention that unless they are part of a registered party, they will be unable to access the CVR; they say this is simply incorrect. *Id.*

### c.   Balance of Hardships and the Public Interest

The Defendants note that because an individual candidate may still self-identify as Libertarian or Libertarian Party, the failure to be recognized as a political party in Maine does not prohibit candidates from running as Libertarians. *Id.* at 24. By contrast, to grant the Plaintiffs the requested relief, in the Defendants' view, would significantly disrupt the state's electoral process. *Id.*

### C.   The Plaintiffs' Reply

In their reply, the Plaintiffs focus on the likelihood of success. *Pls.' Reply* at 2-7. The Plaintiffs argue that the Defendants "miss the central constitutional flaw in the early party qualification deadline that has been fatal to such deadlines in a litany of similar cases." *Id.* at 2. The Plaintiffs again note that "the central flaw of an early party qualification deadline is that it requires minor parties and their supporters to generate support during a period when public attention to and enthusiasm [for] the political process is at its lowest and the issues for the coming general election year have not yet formed." *Id.* The Plaintiffs view the Defendants' arguments about their procrastination as an attempt to "blame the victim." *Id.* They point out that they submitted 6,482 Libertarian Party enrollees, and they could not have anticipated that the Secretary would reject 30% of those enrollments. *Id.* Moreover, the Plaintiffs say that their supposed lack of diligence is "*legally* off the mark" because it is not a legal defense to the constitutional flaws inherent in the statute. *Id.* (emphasis in original). The Plaintiffs dismiss the Defendants' arguments about the lower number of required party enrollees, noting that the "governing caselaw rejects the notion that an unnecessarily early deadline passes constitutional muster if the signature/enrollment requirement is otherwise reasonable." *Id.* at 3 (footnote omitted). Citing *Storer v. Brown*, 415 U.S. 724 (1974), the Plaintiffs argue that there is a fundamental difference between running for office as a member of a political party and running as an independent. *Id.* at 5. Finally, the Plaintiffs contend that the state of Maine has failed to identify any legitimate state interest in the five-business day requirement. *Id.* at 6-7.

## IV.     DISCUSSION

### A.     Preliminary Injunction

#### 1.     Legal Standard

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original) (quoting 11A CHARLES A. WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, pp. 129-30 (2d ed. 1995)); *see also Winter v. Nat'l Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right") (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

#### 2.     Application

As a practical matter, the Court finds that there is an insurmountable barrier to the injunctive relief sought by the Libertarian Party Plaintiffs in this case.  They ask the Court to order (1) reenrollment of the 4,513 voters who enrolled in, then were stripped of, their membership in the Libertarian Party; and (2) an extension of the enrollment period until May 31, 2015 to allow the Libertarian Party to attempt to achieve the 5,000 threshold.  *Pl.'s Ex. 7* at 2 (proposed order instructing the state to accept enrollments "up to and including May 31, 2016").[3]  The Court accepts the Plaintiffs' proposed extended deadline of May 31 as the earliest time as a practical matter by which they could gather the requisite 5,000 enrollments.  The Plaintiffs

---

[3]     The Plaintiffs reiterated the May 31, 2016 date during the March 31, 2016 hearing.

believe this deadline, together with reenrollment, would allow the Libertarian Party to participate in the primary election on June 14, 2016.  As the Court sees it, however, there is a barrier posed by the brief period between when the Libertarian Party, if successful, would become eligible for the ballot and when the Secretary of State would have to prepare and present the ballots to Maine voters—a period of merely fourteen days.  Put simply, the May 31 date would not leave enough time for the state of Maine to run an orderly primary election.

In discussing the December 1 certification deadline, the parties quibbled in their briefs and at oral argument about when exactly the Secretary of State would need to begin preparing for the November general election and, more immediately, the June primary election.  The Plaintiffs clarified at oral argument that they are not challenging the scheduling of the primary election, which is held on the second Tuesday in June.  Thus, it is the earlier date—the June 14, 2016 primary election—from which the entire process backs up.  Referencing the Maine statute, the sequence includes the following steps: (1) the submission of the declaration of intent to form a party between December 1 and December 30 of an even year, 21-A M.R.S. § 303(1); (2) the enrollment of voters beginning the following January and culminating in the party certification on or before an odd-year's December 1, *id.* § 303(2); (3) a caucus requirement for a party to participate in the primary election,[4] *id.* § 303(4); and (4) the filing of nominating petitions by the even year's March 15.  *Id.* § 335(8).

---

[4]     The Plaintiffs have not held a caucus this year, so they have asked to be excused from 21-A M.R.S. § 303(4)'s caucus requirement.

The Court need not reach the constitutionality of the party certification deadline of December 1 because the injunctive relief sought here is a practical impossibility: the Secretary of State cannot certify the Libertarian Party on May 31, 2016 and arrange for their candidates to appear on the primary ballot on June 14, 2016. The Court accepts Deputy Flynn's testimony that preparation of the ballots is a complicated, time-consuming process. Once it becomes clear who will be listed on the primary ballot, the Secretary has to design, print, and distribute ballots to approximately 500 different voting jurisdictions, and the Secretary has to print out approximately 350 ballot layouts, called "ballot styles," together with sample ballots making a total of 700 ballot styles. *Flynn Aff.* ¶ 43. Deputy Flynn's affidavit says that it takes "several weeks" to design, lay out, print, and distribute primary election ballots. *Id.* In her testimony at the hearing on April 5, 2016, Deputy Flynn explained in greater detail the Secretary of State's schedule for printing and mailing out ballots this year, stating that the Secretary provides final proofs of the ballots to the printer by April 15, then the printer provides proofs back to the Secretary by April 29, and once approved, the printer prints, packages, and distributes ballots to the 500 municipalities by May 13. Given that the Secretary of State will give its final approval for the ballots on April 29, more than a month before the Plaintiffs' request for an extended deadline of May 31, it is unsurprising that Deputy Flynn expressed the view that the Secretary was already well beyond being able to place the Libertarian Party on the primary ballot.

In addition to the standard ballot deadlines, Deputy Flynn explained that the Secretary of State must prepare ballots for certain voters even earlier.  In particular, for civilian absentee voters, the ballots must be available to the towns at least thirty days before the election, and for uniformed voters—including those in the military and the merchant marine—as well as overseas voters, federal law requires that the ballots be issued forty-five days before the election.  Regarding the latter group, the issuance date falls on Saturday, April 30, 2016, and Deputy Flynn said that for these voters, the vendor who creates the ballot styles provides them to the Secretary by April 15.  Deputy Flynn stated that Maine has between 1,000 and 2,000 voters who qualify for Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) ballots, and that the Secretary must send those out by April 30.  As this timeline makes clear, the process is already well underway and one critical date has passed.

The Court does not regard the Secretary of State's internal deadlines for the standard ballots as set in stone; nevertheless, the Secretary must abide the forty-five-day advance called for by federal law with regard to certain groups of voters.  52 U.S.C. § 20302(a)(8)(A) ("Each State shall . . . transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . not later than 45 days before the election").  Even if the Court assumed that the final approval for the ballots could be pushed later than April 29, it cannot reasonably assume that it is possible to move that process back more than a month to just fourteen days before the primary election itself.[5]  To do so would disrupt the ballots for the primary election

---

[5]     The Court retains the authority to fashion equitable relief that varies from the specific relief sought by the Plaintiffs.  *Willey v. Petit*, No. 85-0295-B, 1986 U.S. Dist. LEXIS 29459, *7 (D. Me. Feb.

for the state of Maine.  As the Supreme Court wrote in *Storer v. Brown*, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  415 U.S. at 730.

Without addressing the Plaintiffs' constitutional arguments against the December 1 party certification deadline and the five-day verification period following party certification, the Court decides that their requested injunctive relief would send the Maine primary election into chaos.  The Court arrives at this ruling on what are essentially equitable grounds.[6]  *Cf. Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004) ("[I]t would be inequitable to order preliminary relief in a suit filed so gratuitously late in the campaign season. . . .  By waiting as long as he did to sue, and despite the strenuous efforts by the district court and this court to expedite the litigation, Nader created a situation in which any remedial order would throw the state's preparations for election into turmoil"); *De La Fuente v. S.C. Democratic Party*, No. 3:16-cv-00322-

---

10, 1986) ("Implicit in the court's discretion under Rule 65(a) is that the court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case or may enter conditional preliminary relief") (quoting 11A WRIGHT, MILLER & KANE § 2947).  Here, however, there are numerous moving parts in the Secretary's proper preparation for a primary election, and each sequentially depends upon the other; the Court is not confident that it could grant something less than the Plaintiffs' requested relief and avoid sending the entire election process into disarray.

[6]    The Plaintiffs moved for an emergency preliminary injunction and requested oral argument on January 27, 2016.  *Pl.'s Emer. Mot. for Prelim. Inj.* (ECF No. 8).  The Court was prepared to act on the motion on an emergency basis; however, after the filing, Plaintiff's counsel informed the Clerk's Office that there was no need for immediate action and the scheduling of oral argument could await the Secretary's response.  The Court granted the request for oral argument on February 16, 2016, *Order* (ECF No. 12), and, in consultation with counsel, set the oral argument for March 31, 2016.  The hearing, which included taking testimony, commenced March 31, 2016 and concluded April 5, 2016.  *Min. Entry* (ECF No. 24); *Min. Entry* (ECF No. 26).  Although Plaintiffs filed suit on January 4, 2016, *Compl.* (ECF No. 1), the matter was not ready for decision until after the parties completed their oral argument nearly three months later.

26

CMC, 2016 WL 741317, at *7-8, 2016 U.S. Dist. LEXIS 22849, at *24 (D.S.C. Feb. 25, 2016) ("[U]nder federal law, a state has a responsibility to mail absentee ballots to military and oversees voters at least 45 days before the election.  Notwithstanding the lead time required to prepare, print, and ready the ballots for mailing, it is clear that the 45 day requirement for mailing passed weeks before De La Fuente filed suit. . . .  It is simply impossible to achieve the relief De La Fuente seeks within the time constraints of the current primary schedule") (citation omitted).

Given the Plaintiffs seek a drastic and extraordinary remedy and given the Defendants—if ordered by this Court—simply would not have sufficient time to comply, the Court denies the Plaintiff's request for a preliminary injunction.  While the Court finds this case arrives at too late an hour to grant the injunctive relief sought, it reserves judgment on declaratory relief.[7]

## V.   CONCLUSION

The Court DENIES the Plaintiffs' Emergency Motion for Preliminary Injunction (ECF No. 8).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 25th day of April, 2016

---

[7]     The Court will schedule a conference of counsel to discuss the next steps in this case.