UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF MAINE, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 2:16-cv-00002-JAW |
| MATTHEW DUNLAP, et al., | ) ) ) | |
| Defendants. | ) | |

## ORDER ON MOTION FOR RECONSIDERATION

This case relates to the failure of the Libertarian Party of Maine, the Plaintiffs here, to qualify as a party under state law in December 2015.  Under the impression that the Plaintiffs sought to gather additional enrollees until May 31, 2016 and to participate in the primary election on June 14, 2016, the Court denied their motion for preliminary injunction as a practical impossibility: the Secretary of State, the Defendants, simply would not have had enough time to carry out the primary election.  The Plaintiffs now move for reconsideration arguing that they did not seek participation in the primary election.

As significant constitutional rights are at stake, the Court grants the motion to reconsider.  It finds the Plaintiffs have shown a likelihood of success on their claim that Maine's party-certification deadline of December 1 is unconstitutionally early.  To deprive the Plaintiffs of participation in the general election would constitute irreparable harm, which outweighs any harm to the Defendants.  Moreover, the important public interest in orderly elections must bend to the overriding public

interest in constitutional rights that protect a party's access to the ballot. Accordingly, the Court, acting within its discretion, fashions relief to protect the Plaintiffs' constitutional rights, while not imperiling the Defendants' ability to prepare for and administer the general election on November 8, 2016.

## I.   PROCEDURAL HISTORY

On January 4, 2016, the Plaintiffs, the Libertarian Party of Maine, Inc. and several individuals affiliated with the Libertarian Party, filed a complaint against Matthew Dunlap, the Secretary of State for the state of Maine (Secretary Dunlap); Julia Flynn, the Deputy Secretary of State for the state of Maine (Deputy Flynn); Tracy Willet, the Assistant Director, Division of Elections, state of Maine (Assistant Director Willet); and the Maine Department of the Secretary of State (the Department or the Secretary), seeking a declaratory judgment and an injunction concerning the Defendants' actions and omissions regarding the attempts of the Libertarian Party to qualify as a recognized political party. *Compl. for Declaratory & Injunctive Relief* (ECF No. 1) (*Compl.*).  On March 8, 2016, the Defendants filed an answer to the Plaintiffs' Complaint. *Defs.' Ans. to Pls.' Compl.* (ECF No. 17).

On January 27, 2016, the Plaintiffs filed an emergency motion for preliminary injunction, a request for oral argument, and a supporting memorandum. *Pls.' Emer. Mot. for a Prelim. Inj.* (ECF No. 8); *Id.* Attach. 1 *Mem. of Law in Supp. of Pls.' Emer. Mot. for Prelim. Inj.* (*Pls.' Mem.*).  On February 17, 2016, the Defendants filed their opposition. *Defs.' Mem. in Opp'n to Pls.' Mot. for Prelim. Inj.* (ECF No. 14) (*Defs.' Opp'n*).  On March 9, 2016, the Plaintiffs filed a reply to the Defendants' opposition.

*Reply Mem. in Supp. of Pls.' Emer. Mot. for Prelim. Inj.* (ECF No. 19) (*Pls.' Reply I*). On February 16, 2016, the Court granted the Plaintiffs' motion for oral argument. *Order Granting Mot. for Oral Arg./Hr'g* (ECF No. 12).  On March 31, 2016, the Court held oral argument, which included the presentation of testimonial evidence, *Min. Entry* (ECF No. 24), and which broke for the day then resumed and concluded on April 5, 2016.  *Min. Entry* (ECF No. 26).  On April 25, 2016, the Court issued an order denying the Plaintiffs' emergency motion for preliminary injunction.  *Order on Mot. for Prelim. Inj.* (ECF No. 30) (*Order*).

On April 29, 2016, the Plaintiffs filed an emergency motion for reconsideration. *Pls.' Emer. Mot. for Recons.* (ECF No. 32) (*Pls.' Mot.*).  The Defendants responded on May 6, 2016, *Defs.' Mem. in Opp'n to Pls.' Mot. for Recons.* (ECF No. 34) (*Defs.' Resp.*), and the Plaintiffs replied on May 11, 2016.  *Reply Mem. in Supp. of Pls.' Emer. Mot. for Recons.* (ECF No. 35) (*Pls.' Reply II*).  On May 16, 2016, the Court held a hearing on the motion for reconsideration.  *Min. Entry* (ECF No. 36).

## II.   THE PARTIES' POSITIONS

### A.   The Plaintiffs' Motion

The Plaintiffs move pursuant to Local Rule 7(g), arguing that "the Court's denial of the request for preliminary injunctive relief is based on a manifest error of fact and/or law."  *Pls.' Mot.* at 2-3 (citing D. ME. LOC. R. 7(g)).  Although they acknowledge that they initially requested participation in the June 14, 2016 primary election, they say that they withdrew that request between the filing of their preliminary injunction motion on January 27, 2016 and the hearing on March 31,

2016. By the later date, the Plaintiffs "focused on enrolling voters in the Libertarian Party, nominating candidates by convention rather than by primary, and securing placement of its duly nominated candidates on the general election ballot, including candidates for President and Vice President." *Id.* at 3 (citing *Pls.' Ex. 7*). At the end of their motion, the Plaintiffs again change the relief they seek, asking for "not less than forty-five (45) days from the date of the Court's ruling to enroll additional voters in the Libertarian Party and file a declaration with the Secretary of State, instead of the May 31st deadline . . . ." *Id.* at 6.

## B.   The Defendants' Response

The Defendants do not contest that the Plaintiffs no longer sought participation in the primary election by the time of the hearing. *Defs.' Resp.* at 2. Nonetheless, they write that "the Court's findings are factually and legally correct and support denial of the preliminary injunction." *Id.*

The Defendants point out the ways in which the Plaintiffs' requested relief, in particular ordering re-enrollment and allowing for new enrollments, "would disrupt the orderly process of Maine's elections." *Id.* at 4. While re-enrollment is "technically possible," the Defendants raise concerns that "doing so could cause significant legal harm because voters have a right to make their own enrollment decisions." *Id.* "To avoid violating voters' rights," the Defendants contend, "some type of notice would need to be sent to the 4,513 voters informing them of the injunction and asking them to affirmatively state within a certain period of time whether they wish to be re-enrolled in the Libertarian Party." *Id.* at 5. This would require the Court "to outline

a procedure and a time frame for the issuance of and response to the notices," which in turn "would impose new administrative burdens on the Secretary of State's small elections staff . . . ." *Id.* The Defendants also bristle at enrolling new Libertarians "during the same time period in which they must process applications for absentee ballots, handle the normal flow of voter registration applications leading up to the election, conduct the primary election, tabulate the results of that election, and enter voter history for that election." *Id.*

The Defendants consider the Plaintiffs' request to nominate candidates via convention as essentially "asking the Court to re-write Maine election law to fashion an entirely separate legal process unique to the Libertarian Party." *Id.* at 6. Finally, on the equities, the Defendants assert that "the Plaintiffs are not entitled to injunctive relief to remedy a problem of their own making." *Id.*

### C.    The Plaintiffs' Reply

The Plaintiffs begin by pointing out that the Defendants do not dispute the "central basis" of their motion, i.e., that they did not seek participation in the primary election. *Pls.' Reply II* at 1. They raise several objections to the Defendants' claim that they cannot re-enroll Libertarians without burdening the Secretary and compromising voters' rights. First, the Plaintiffs say that the argument—raised for the first time in the Defendants' response—comes too late. *Id.* at 2. Second, according to the Plaintiffs and contrary to the position taken by the Defendants in their response, Deputy Flynn testified at the hearing that her office would be able to re-enroll Libertarians. *Id.* at 3. Third, they perceive "a bizarre form of Chutzpah laced

5

with a twist of irony" in the Defendants' argument that re-enrollment would violate voters' rights: "By feigning newfound respect for the associational rights of these 4,513 voters, Defendants seek to persuade the Court not to intervene on their behalf and on behalf of the Libertarian Party with whom they sought to associate . . . ." *Id.* at 3-4.

To the extent the Court accepts the voters' rights argument, the Plaintiffs offer two fixes.  First, "[i]f in fact any of those 4,513 unenrolled voters have subsequently enrolled in other political parties, then the Secretary of State can notify such persons of the Court's ruling and give them the opportunity to either remain enrolled in that party or instead be reenrolled in the Libertarian." *Id.* at 4.  Second, the Court could order the Secretary of State to give the Libertarian Party credit for the 4,513 verified enrollments without re-enrolling any Libertarians.  *Id.*

"Above all else," the Plaintiffs emphasize, "the theme of the relief should be to enjoin the state from enforcing the December 1st party qualification deadline and the consequences thereof." *Id.* (citing *Stoddard v. Quinn*, 593 F. Supp. 300 (D. Me. 1984)). They close by arguing that whatever their shortcomings in attempting to qualify as a party, these shortcoming do not offer the Defendants "a legal defense to the constitutional flaws inherent in the statute." *Id.* at 5.

## III.   DISCUSSION

### A.   Motion for Reconsideration

Pursuant to Local Rule 7(g), a motion to reconsider an interlocutory order of the court "shall demonstrate that the order was based on a manifest error of fact or

law . . . ." D. ME. LOC. R. 7(g).  In addition to manifest error of fact or law, a district court may grant a motion for reconsideration "if the Court has 'patently misunderstood' a party, or if the court made an error 'not of reasoning but of apprehension.'" *Pro Con, Inc. v. Interstate Fire & Cas. Co.*, 831 F. Supp. 2d 367, 371 (D. Me. 2011) (quoting *Ruiz Rivera v. Pfizer Pharms., LLC,* 521 F.3d 76, 82 (1st Cir. 2008)).  "A district court has 'substantial discretion and broad authority to grant or deny' a motion for reconsideration." *Id.* (quoting *Ruiz Rivera*, 521 F.3d at 81).

The Court's order rested on the practical impossibility of extending the certification deadline to May 31, 2016 and allowing the Libertarian Party to participate in the primary election on June 14, 2016.  *Order* at 22-27.  It concluded that "[p]ut simply, the May 31 date would not leave enough time for the state of Maine to run an orderly primary election."  *Id.* at 23.

The Plaintiffs portray the Court as confused about their request to participate in the primary, which they admit to have initially requested but from which they claim to have later retreated, and argue that its decision to deny the preliminary injunction follows from that confusion and constitutes a manifest error of either fact or law. *Pls.' Mot.* at 1-6.  The Plaintiffs assert that their request for injunctive relief "did not include a single request having anything to do with this year's primary election, scheduled to occur on June 14, 2016."  *Id.* at 2.  In short, the Plaintiffs' assertion is incorrect.  In the Plaintiffs' proposed order, they expressly included a request "to participate in the primary election and nominate Libertarian Party candidates for placement on the general election ballot . . . ." *Pls.' Ex.* 7 at 1-2.  So, in

deciding the original order, in view of their specific request to participate in the primary election, the Court concluded that the remedies the Plaintiffs suggested in the proposed order would not achieve the relief they had requested, and the Court denied the motion for injunctive relief based on practical impossibility.

Were this an ordinary case, the Court would readily conclude that the Libertarian Party had unintentionally misled the Court as to the relief it was seeking, and the Court would deny a motion for reconsideration caused by the Plaintiffs' own mistake. Nevertheless, the matter before the Court raises important questions of First and Fourteenth Amendment rights and the Libertarian Party's ability to place its candidates on the general election ballot. Furthermore, the Defendants are not asserting that the Plaintiffs waived the arguments they are now pressing. Accordingly, the Court reconsiders its earlier order and reaches the merits of the Plaintiffs' arguments in order to assure full protection of essential constitutional guarantees.

### B.   Judicial Review of the State Electoral Scheme

Before turning to the substance of the motion now under reconsideration, the Court sets out the principles that guide its review of the state electoral scheme.

As reflected in its earlier order, the Court takes full measure of the state prerogative to regulate elections. The Supreme Court has written that such regulation is "[c]ommon sense," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992), and that "[a]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to

accompany the democratic process," *Storer v. Brown*, 415 U.S. 724, 730 (1974); *see also Libertarian Party of Me. v. Diamond*, 922 F.2d 365, 370 (1st Cir. 1993) (quoting *Storer*).  Indeed, the Constitution reserves to the states the power to prescribe "Times, Places, and Manner of holding Elections for Senators and Representatives . . . ."  U.S. CONST. art. I, § 4, cl. 1.

At the same time, the issue before the Court involves first principles, such as "the right of individuals to associate for the advancement of political beliefs" and "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively"—both rights that, "of course, rank among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).  In the words of the Supreme Court, "[r]epresentative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views."  *Calif. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000).  "It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick*, 504 U.S. at 433 (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).

The Court thus undertakes its review with an appreciation of the need for state electoral regulations, but also with a duty to uphold constitutional standards.

## C.    Preliminary Injunction

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis

in original) (quoting 11A CHARLES A. WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed. 1995)); *see also Winter v. Nat'l Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right") (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

"To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements*, 794 F.3d 168, 171 (1st Cir. 2015) (citing *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.,* 645 F.3d 26, 32 (1st Cir. 2011)); *see also Bruns v. Mayhew*, 750 F.3d 61, 65 (1st Cir. 2014) (setting out the same preliminary injunction standard). The "four factors are not entitled to equal weight in the decisional calculus; rather, '[l]ikelihood of success is the main bearing wall of the four-factor framework.'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9-10 (1st Cir. 2013) (alteration in original) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)).

### 1.     Likelihood of Success

In *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992), the Supreme Court established a balancing test to evaluate challenges to state ballot access requirements:

> A court considering a challenge to a state election law must weigh the
> character and magnitude of the asserted injury to the rights protected

by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

*Burdick*, 504 U.S. at 434 (citations and internal punctuation omitted). The First Circuit has written of the *Anderson-Burdick* test as a "sliding scale approach." *Libertarian Party of N.H. v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011) (citing *Barr v. Galvin,* 626 F.3d 99, 109 (1st Cir. 2010); *Werme v. Merrill* 84 F.3d 479, 483 (1st Cir. 1996)). "If a regulation places 'severe restrictions on a plaintiff's First and Fourteenth Amendment rights, 'the regulation must be narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Werme*, 84 F.3d at 484) If, however, "a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (quoting *Werme*, 84 F.3d at 484).

### a.    Step One: Burden on Plaintiff

First, the Court considers the character and magnitude of the injury to First and Fourteenth Amendment rights.

The Plaintiffs write that the December 1 deadline comes more than six months before the primary election and more than eleven months before the general election, and as a consequence, "all 5,000 enrollments must be gathered during an odd-numbered year when public attention to and enthusiasm for the political process is historically lowest, when the issues for the coming general election year are not yet

fully formed, and when candidates are not yet declared." *Pls.' Mem*. at 16.  Moreover, they point out that courts in no fewer than ten jurisdictions have struck deadlines later than Maine's, and they could not find a single case upholding a deadline as early as Maine's.  *Id*. at 17 (collecting cases).  At oral argument on April 5, 2016, the Plaintiffs identified *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006) as the leading case supporting their argument.  *Min. Entry* (ECF No. 26).

The Defendants, meanwhile, urge the Court to take a larger view.  As they see it, neither *Blackwell* nor Plaintiffs' other cases "assessed the constitutionality of a state law based on a calendar date, alone . . . .  Viewed in isolation, a calendar date is meaningless." *Defs.' Opp'n* at 10.  Rather, "the court must look at the combined effect of all the relevant provisions in a state's election law as well as the factual context." *Id*.  Following this approach, the Defendants assess Maine's process together with its requirements for the number of voters (5,000) and the time period for enrolling those voters (a year), as well as its provision of an alternative route to ballot access.  *Id*. at 10-15.

Indeed, the Court's analysis must not focus on only one aspect of the qualification process, as constitutional challenges "cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789 (quoting *Storer,* 415 U.S. at 730).  The Court therefore analyzes the early deadline together with other relevant aspects of the Maine law.  The caselaw is complex, as the processes by which a state recognizes a new party (the situation on these facts) or permits a non-party candidate to access the ballot (a related line of cases) contain

12

many moving parts.  That said, *Blackwell* presents a similar fact pattern to the case at hand.

In *Blackwell*, the Sixth Circuit addressed the constitutionality of "the combination of two Ohio election regulations—the requirement that all political parties nominate their candidates via primary election and the requirement that all minor political parties file a petition with the Secretary 120 days in advance of the primary . . . ."  462 F.3d at 582.  Likewise, the Maine regulations require participation in the primary election, 21-A M.R.S. § 331(1), and require the would-be party to file a certification with the Secretary on or before December 1 of the odd-numbered year preceding the election year.  *Id.* § 303(2).  The question before the Court is whether this deadline, in the context of the election scheme, is too early.  Measuring the Maine statute's deadline in terms of days, the December 1, 2015 certification deadline precedes the June 14, 2016 primary election by 196 days and the November 8, 2016 general election by 343 days.

"[T]he great weight of authority . . . has distinguished between filing deadlines well in advance of the primary and general elections and deadlines falling closer to the dates of those elections."  *Blackwell*, 462 F.3d at 590; s*ee, e.g.*, *id*. at 582 (striking petition deadline for new party formation of 120 days before the primary election); *New Alliance Party of Ala. v. Hand,* 933 F.2d 1568, 1576 (11th Cir. 1991) (striking deadline sixty days before the primary and seven months before the general election); *McLain v. Meier,* 637 F.2d 1159, 1163-64 (8th Cir. 1980) (striking deadline more than ninety days before the primary and more than 150 days before the general election);

*MacBride v. Exon,* 558 F.2d 443, 449 (8th Cir. 1977) (striking deadline ninety days before the primary and nine months before the general election); *Calif. Justice Comm. v. Bowen*, No. CV 12–3956 PA, 2012 WL 5057625, at *4-9, 2012 U.S. Dist. LEXIS 150424, at *16-25 (C.D. Cal. Oct. 18, 2012) (striking deadline 135 days before the primary and ten months before the general election); *Libertarian Party of Tenn. v. Goins*, 793 F. Supp. 2d 1064, 1086-89 (M.D. Tenn. 2010) (striking deadline 120 days before the primary and at least eight months before the general election); *Citizens to Establish a Reform Party in Ark. v. Priest*, 970 F. Supp. 690, 697-98 (E.D. Ark. 1996) (striking deadline five months before the primary and eleven months before the general election); *Libertarian Party of Nev. v. Swackhamer*, 638 F. Supp. 565, 570-71 (D. Nev. 1986) (striking deadline that was effectively 140 days before the primary when the 90-day official deadline was added to the 50-day verification period). Even in the company of these invalidated deadlines, Maine's deadline stands out.

Other aspects of the Maine party-qualification process exacerbate the impact of the deadline's earliness. First, the process is such that the de facto deadline is even earlier. At the hearings on March 31, 2016 and April 5, 2016, Deputy Flynn's testimony established that the party submits enrollment forms to a municipal registrar, then the registrar enters properly completed enrollments in to the Central Voter Registration System (CVR), at which point the Secretary can verify the total by simply logging in to the CVR and checking the number. *Min. Entry* (ECF No. 24); *Min. Entry* (ECF No. 26); *see also Defs.' Opp'n* Attach. 1 *Julia Flynn Aff.* ¶¶ 19-26 (ECF No. 14) (explaining enrollment process). The problem is the lag between (1)

14

when the municipal registrar receives the enrollment and (2) when it is entered in to the CVR and thereby counted toward the 5,000-voter threshold. By the Defendants' own admission, the workings of the enrollment process push the true deadline earlier than December 1. *Defs. Opp'n* at 22 ("[A] reasonably prudent party organization would anticipate the need to give local registrars some time to review and verify the voter cards with Libertarian Party enrollments before December 1st so that the voters' names would appear as fully enrolled by the time the SOS queried the CVR within five business days of that deadline").

This point dovetails with the Plaintiffs' other objection to the Maine party-qualification process: the narrowness of the five-business-day verification period following party certification on December 1. *See* 21-A M.R.S. § 303(2) ("The Secretary of State shall verify the proposed party's enrollment figures within 5 business days of receiving the proposed party's certification and notify the applicants whether the proposed party has met the requirements to participate in a primary election in the subsequent even-numbered year"); *Pls.' Mem.* at 25 (objection thereto). During her testimony, Deputy Flynn explained the reasoning underlying the five-business-day verification period. She conceded that if the aspiring party filed a completed enrollment form in late November, the municipal registrar might not be able to process the form and enter it in to the CVR until sometime after December 1. The five-business-day period was designed to allow such last minute enrollments to be counted.

However, as this case revealed, the five-business-day interval may be too short. Here, the Libertarian Party filed its certification, as required, on December 1, 2015. *Jt. Ex.* 3. The same day, Melissa Packard, Director of Elections at the Secretary of State's Office, emailed Jorge Maderal and attached the Enrolled and Registered Report she had run that day. *Jt. Ex.* 4. She wrote that if Mr. Maderal wrote back to her indicating there was a discrepancy between cards submitted and voters enrolled, she would check with the municipalities to determine whether the registrars had processed the enrollment forms or whether they were still pending. *Id.*

Mr. Maderal reviewed the Enrolled and Registered Report and wrote Ms. Packard on December 2, highlighting those municipalities with significant discrepancies between the number of cards the Libertarian Party turned in to the municipal clerk and the number of verified enrollees. *Jt. Ex.* 5. By his calculations, the top seven municipalities had rejected 1,044 enrollment forms, which he noted would be more than enough to bring the Libertarian Party over the 5,000 threshold. *Id.* In response, the Secretary contacted the seven towns that showed the largest discrepancies and determined that five of those municipalities had fully processed the enrollment forms, but two had not. *Jt. Ex.* 7. She discovered that the cities of Lewiston and Auburn had been unable for local reasons to process all the enrollment forms, and the Secretary agreed to allow Lewiston and Auburn to complete the process, *id.*, even though Deputy Flynn conceded in her testimony that the statute did not authorize a certification beyond the five-business-days limit in 21 M.R.S. § 303(2).

16

This episode confirms that the five-business-day provision may be too short or should at least provide for a discretionary extension for good cause.  Presumably, if the verification period were extended beyond five business days, then (1) municipalities could enter enrollments in to the CVR for a longer period after December 1 and (2) the Secretary could wait longer to log in to CVR to verify the number of enrollments as they continued to trickle in from the municipalities.  This would assuage concerns about the shortness of the verification period aggravating the earliness of the certification deadline.  Moreover, authorizing the Secretary to extend for good cause should avoid the absence of any standards for extension under the current provision.

Even so, the Libertarian Party has not demonstrated that the five-business-day limitation had any impact on its certification attempt.  As Deputy Flynn explained it, the Secretary's role in determining whether the 5,000 enrollment figure has been met is perfunctory.  The Secretary merely runs the total number of Libertarian Party enrollees reflected in the CVR and makes a numerical determination as to whether the total equals or exceeds 5,000; the Secretary does not undertake a qualitative review of the enrollment denials.  Once the Secretary agreed to allow the cities of Lewiston and Auburn to file enrollments after the five-business-day period, any problems that the Libertarian Party identified with the shortness of the five-business-day interval were obviated.[1]

---

[1]      There is no evidence, for instance, of other late-filed municipal submissions.  In other words, there is nothing in this record showing that the Secretary received Libertarian Party enrollments from the municipalities after the five-business-day period that the municipalities had themselves received before December 1, 2015.

Another exacerbating aspect is that the disqualification rate for the enrollment forms was high.  At the hearing, the parties entered into evidence and the Court reviewed a few rejected forms that arguably might have been counted toward the 5,000-voter threshold.  *See Pls.' Ex. 4* (Portland's rejected enrollment forms).  The sheer numbers raise questions about the accuracy of the process: the Plaintiffs submitted 6,482 enrollment forms and the Secretary ultimately accepted 4,513, a 30% disqualification rate.  *See Pls. Mot.* Attach. 2 *Jorge Maderal Aff.* ¶ 16 (ECF No. 8). This leads to whether there is a legal mechanism to challenge enrollment disqualifications.

The answer is that there is no express statutory review mechanism for the party to challenge the Secretary's refusal of its certification.  Maine law does provide a mechanism for an individual voter to challenge a decision of the municipal registrar to reject his or her registration application.  21-A M.R.S. § 103.  The aggrieved person has the right to demand a hearing before the local Registration Appeals Board and a further right to challenge the Registration Appeals Board's decision to the state of Maine Superior Court.  *Id.* § 103(6).  But this statutory mechanism is an awkward fit for the formation of a third party.  The third party has no statutory right to challenge the municipal registrar's rejection of its enrollment forms; the statutory right rests instead with the rejected voter, who is not likely to be directly involved in the third party's certification process.[2]

---

[2]      Assuming it has standing, the new party may have the right to challenge the Secretary's refusal to issue a certification as a final agency action pursuant to the Maine Administrative Procedure Act, 5 M.R.S. § 11001, *et seq.*, under Maine Rule of Civil Procedure 80C by filing an action in state of Maine Superior Court.  *See* ME. R. CIV. P. 80C(a).  But unlike the review process to challenge a

The omission of a statutory review mechanism is all the more glaring given the relatively elaborate mechanism provided to any "registered voter residing in the electoral division of" a candidate who was nominated via petition. *Id.* 337(2)(A). Section 337(2) provides for a public hearing before the Secretary, then the Secretary makes a ruling, then either party can challenge the ruling in Superior Court, then the aggrieved party can appeal to the Law Court. *Id.* § 337(2)(B)-(E). It seems odd that Maine provides greater recourse to a registered voter who, for whatever reason, wants to keep a petition candidate off the primary ballot than to an aspiring political party that has its own application for certification rejected.

Regarding the character of the injury caused by an early deadline, the Plaintiffs—complaining that they must generate support "when the public is not yet fully engaged or paying attention"—quote *Blackwell* for the proposition that the deadline imposes a burden by "requir[ing] minor political parties to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized." *Pls.' Mem.* at 18 (quoting *Blackwell*, 462 F.3d at 586).

The Court accepts this proposition with a couple of reservations. First, even though the Sixth Circuit decided *Blackwell* in 2006, it seems that the advent of the twenty-four-hour news cycle has created a perpetual election cycle with no discernable rest period during the off-year. This point in *Blackwell* was stronger in

---

nominated candidate, *see* 21-A M.R.S. § 337(2)(A), there is no right to interim review by the Secretary. For example, if the registrar rejected an enrollee's application on the ground that the voter's street address was illegible and the new party disagreed, the availability of some sort of mechanism to bring that question to the attention of the Secretary, sort of full-blown civil litigation, seems both preferable and more efficient.

2006 than it is today.  Next, although the Maine Libertarian Party in this case complains about the need to enroll voters during the off-year, in 2015, its New Hampshire counterpart made precisely the opposite argument by complaining about the need to enroll voters during the election year:

> LPNH [Libertarian Party of New Hampshire] next argues that HB 1542 imposes a severe burden on its ability to access the ballot because it places the petitioning period squarely within the campaign season preceding the general election.  That placement, LPNH argues, imposes a severe burden because it forces third parties to focus exclusively on petitioning during a period that they would otherwise devote to campaigning, placing them at an unfair disadvantage compared to the major parties.

*Libertarian Party of N.H. v. Gardner*, 126 F. Supp. 3d 194, 203 (D.N.H. 2015), *appeal filed*, Sept. 25, 2015, C.A. No. 15-2068.  This contradiction makes the Court wonder whether the Libertarian Party's real complaint is not with the seasonality of the enrollment requirements, but with the enrollment requirements themselves.

Despite these reservations, the Court acknowledges that other courts, including *Blackwell*, have been concerned about off-year election requirements, and there is some logical force to the argument that the average voter is less focused on politics during the off-year than during the year of a general election.  There is perhaps stronger logical force to the related but distinct notion that issues continue to develop well into the election year, so the Plaintiffs are on more solid ground when they quote *Blackwell* for the proposition that an early deadline imposes a burden by "hav[ing] the effect of ensuring that any contentious issue raised in the same year as an election cannot be responded to by the formation of a new political party."  *Pls.' Mem.* at 18 (quoting *Blackwell*, 462 F.3d at 586).

20

Regarding the injury's magnitude, a review of the caselaw shows that Maine has an earlier deadline relative to the primary and general elections than several states whose deadlines were struck as too early. Moreover, taking a broad view of the party-qualification process, as the Court must, it sees a deadline that is effectively even earlier than December 1 followed by a narrow verification period, as well as the fact that the state disqualified nearly one in three enrollment forms, yet there is no express statutory review mechanism through which to contest those disqualifications. In sum, the Plaintiffs have shown that their burden is severe.

The Defendants raise two notable objections. First, at the May 16, 2016 hearing, the Court asked the Defendants whether they could cite a single case in which a comparably early deadline was challenged and survived. They cited *Arizona Green Party v. Bennett*, which upheld a law requiring a new party to file a petition with the requisite number of signatures 180 days before the primary election. 20 F. Supp. 3d 740, 742 (D. Ariz. 2014). But the Arizona Green Party "never filed such a petition," *id.*, and the *Bennett* Court was left without an evidentiary basis on which to find a severe burden. *Id.* at 747 ("Plaintiffs have not demonstrated that a 180–day deadline alone, considered outside the context of the election cycle requiring it, necessarily imposes a severe burden. And they have not offered evidence—or even alleged—that the other interrelated provisions governing the election cycle impose a severe burden"). Unlike the Arizona Green Party, the Libertarian Party of Maine attempted to qualify as a party under state law before challenging the state's party-

21

qualification process.  It also does not exclusively challenge the early certification deadline.  The Court is thus unpersuaded by *Bennett*.

The next objection calls for careful consideration.  In *Barr v. Galvin*, the Libertarian Party of Massachusetts (LP Mass.)—an unrecognized party—needed to file nomination papers signed by 10,000 registered voters to get their presidential and vice-presidential candidates on the general election ballot.  626 F.3d 99, 102 (1st Cir. 2010) (*Barr I*).  In early 2008, LP Mass. began gathering nomination papers before it knew who the Libertarian Party's nominees for the positions would be, and the state told them that it could prepare a form for the party to request substitution.  *Id.* at 103.  George Phillies and Chris Bennett went about gathering signatures for their candidacy, but they fell to Bob Barr and Wayne Root as the nominees for President and Vice President at the Libertarian Party's national nominating convention in late May 2008.  *Id.*  After the convention, the state informed Mr. Phillies that a substitution would not be permissible.  *Id.*  Nonetheless, two months later, LP Mass. submitted 10,000 signatures for the Phillies/Bennett ticket, and the state refused to substitute in Barr/Root.  *Id.*  The district court granted a preliminary injunction placing the Barr/Root ticket on the ballot and later granted LP Mass's cross-motion for summary judgment by ruling, inter alia, that a right to substitute was guaranteed by the Equal Protection Clause.  *Id.* at 104.

The First Circuit reversed on this point.  Political parties could achieve recognized status in Massachusetts by having a candidate for statewide office garner three percent of the vote in the most recent biennial election or enrolling one percent

of the total registered electorate. *Id.* at 102. Only unrecognized parties, like LP Mass., needed to file nomination papers signed by 10,000 voters, as recognized parties' state committees simply submitted a form with their presidential ticket in the September preceding the election. *Id.* The *Barr* Court focused on the party-qualification process as well as the nomination process by which independent candidates access the ballot. *Id.* at 109-10. It also mentioned that the Secretary informed Barr and Root that it would not substitute them on to the ticket two months before petitions were due, and yet they did not try to petition for their own ticket, instead continuing to rely on the substitution method. *Id.* at 110. The Court found "[t]he Massachusetts ballot access provisions at issue here are nondiscriminatory," *id.* at 109, and had "no doubt" that rational basis review was called for. *Id.* at 110.

For present purposes, this is all prelude to the *Barr* Court's denial of rehearing, which offers the First Circuit's only commentary on the Plaintiffs' leading case: *Blackwell*. *See Barr v. Galvin*, 630 F.3d 250 (1st Cir. 2010) (*Barr II*). The Plaintiffs argued that the First Circuit's decision in *Barr I* contrasted with *Blackwell* so as to create a circuit split. *Id.* at 250. After sketching the Ohio ballot-access scheme, the Court wrote:

> The Massachusetts scheme at issue in this case is materially different. It allows candidates to ally themselves with a "political designation" of their choosing even where they access the ballot through the state's alternative petition mechanism. Massachusetts requires that such petitions be submitted to local canvassing officials in late July. Rather than requiring that a minor party necessarily designate its candidates a full year prior to the upcoming presidential election, as was the case under the Ohio statute if a candidate wished to appear on the ballot with a party designation of any sort, the Massachusetts scheme demands that

such a candidate file papers less than four months in advance of the election.

*Id.* at 251.  Thus, "[t]he timing constraints imposed by the respective state ballot-access schemes are sufficiently distinct that the panel's conclusion as to the constitutionality of the Massachusetts scheme is not at odds with the Sixth Circuit's determination as to the constitutionality of the Ohio scheme." *Id.*

The Court does not read *Barr II* as precluding *Blackwell*'s application on these facts.  It could decide that Maine's nominating petition process—like Massachusetts, unlike Ohio—allows candidates to designate a party affiliation, and so the same distinguishing feature in *Barr II* is present here as well.  But the Libertarian Party of Maine does not seek substitution of one ticket for another.  It also does not seek mere ballot access.  It seeks to organize as a political party under Maine law, and it would miss the point to decide that Maine's petition process for individual candidates cures an alleged constitutional defect in the state's party-qualification process—the very defect, a too-early deadline, that arguably prevented Plaintiffs from achieving party status in the first place.  To read *Barr II* in this way would allow a potentially unconstitutional barrier to new party formation to remain standing.

As the Court sees it, party certification implicates rights over and above ballot access.  The Supreme Court has repeatedly announced that a party, *qua* party, has a constitutional interest in coming into being.  *Norman v. Reed*, 502 U.S. 279, 288 (1992) ("[T]his Court has recognized the constitutional right of citizens to create and develop new political parties.  The right derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather

in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences") (footnote and citations omitted); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986) ("The freedom of association protected by the First and Fourteenth Amendments includes partisan political organization") (citations omitted); *Storer*, 415 U.S. at 745 (1974) ("[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other").

In short, neither *Bennett* nor the *Barr* decisions changes the Court's conclusion at this preliminary juncture that the Plaintiffs have shown a severe burden.

### b.    Step Two: State Interest

The Court having preliminarily found a severe burden, the Defendants must show that their party-qualification process is "narrowly drawn to advance a state interest of compelling importance." *Gardner*, 638 F.3d at 14 (quoting *Werme*, 84 F.3d at 484).

The Defendants say Maine's party-qualification process protects the state's interests in "administering an orderly primary election process" and "afford[ing] all party candidates the same period of time in which to circulate nominating petitions for the primary." *Defs.' Opp'n* at 16.  "First and foremost," they explain, the December 1 deadline allows party candidates to gather signatures for nominating petitions between January 1, when they are issued, and March 15, when they are due.  *Id.* at 16-17.  In particular, they claim the December 1 deadline is necessary to prepare the nominating petitions for January 1, *id.* at 17, and they claim the March 15 deadline,

well ahead of the primary election in June, is necessary to provide time for resolution of any challenges to a petition's validity—an elaborate statutory process, detailed above, that can take as long as sixty-five to seventy days. *Id.* The Defendants also assert interests in preparing an array of ballots and ensuring a political party has a basic level of support. *Id.* at 17-18.

The Plaintiffs "concede that the state has [a] general interest in regulating the conduct of its elections and requiring that new parties demonstrate a modicum of public support." *Pls.' Reply I* at 6. They object to the notion that the state needs one month (December 1-January 1) to prepare the nominating petitions on which the candidates then gather signatures between January 1 and the due date of March 15. *Id.* First, they argue that a candidate can simply write his or her party's name in a blank space on the petition, so no preparation is needed at all, let alone a full month. *Id.* at 6 n.6. Second, they argue that a candidate does not need to begin collecting signatures on January 1 to meet the due date of March 15. *Id.* Third, they argue that a candidate ought to be able to gather signatures for his or her nominating petition while the party simultaneously enrolls voters in an effort to win state recognition. *Id.* The Plaintiffs also claim that gathering 5,000 signatures to become a recognized party is sufficient evidence of a basic level of support. *Id.* at 7.

At this stage of the proceedings, the Court does not view the December 1 deadline as serving a compelling state interest that has been narrowly drawn. Without question, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the

democratic processes." *Storer*, 415 U.S. at 730.  Moreover, there is ample authority for the proposition that the state has an interest in protecting the electoral process's integrity by requiring a candidate to show a "modicum of support among the potential voters for the office." *Munro v. Socialist Workers Party,* 479 U.S. 189, 193 (1987); *see also Diamond*, 992 F.2d at 371 ("The 'support' requirement is meant to safeguard the integrity of elections by avoiding overloaded ballots and frivolous candidacies, which diminish victory margins, contribute to the cost of conducting elections, confuse and frustrate voters, increase the need for burdensome runoffs, and may ultimately discourage voter participation in the electoral process") (citations omitted).

The problem is with the tailoring.  For instance, the gap between December 1 and January 1 strikes the Court as unnecessary given the primary nomination petition, in its current form, provides a blank space for the party name.  *Joint Ex. 11*. A candidate could easily handwrite the party name instead of waiting about a month for the Secretary to print forms with the same information.  Additionally, the gap between March 15 and the primary election in June strikes the Court as overly drawn-out.  As discussed above, it is difficult to discern the state interest in allowing voters to challenge primary nomination petitions that the Secretary has reviewed and approved, especially given that the challenge process—if followed through to its conclusion—may take sixty-five to seventy days.  21-A M.R.S. § 337.  If the state were to trim down the lag in these timelines, the unconstitutionally early December 1

deadline would be pushed closer to the primary and general elections.  The Court thus cannot find the Maine electoral scheme to be narrowly tailored.[3]

In sum, the Court concludes that the Plaintiffs have shown a likelihood of success on the merits.

### 2.    Irreparable Harm, Balance of the Equities, and the Public Interest

If the Plaintiffs had achieved party qualification, they would have been able to certify to the Secretary the names of the Libertarian Party's presidential ticket.  The Defendants argue the Plaintiffs have not been irreparably harmed, as they can pursue an alternative route to the same end by petitioning to get the Libertarian Party's presidential ticket on the general election ballot.  *Defs.' Opp'n* at 22 (citing *Diamond*, 992 F.2d at 374-75).[4]  This route would require the Plaintiffs to gather 4,000 signatures by July 25, 2016.  21-A M.R.S. § 354(5)(A), (7)(B).  At the May 16, 2016 hearing, the Plaintiffs' counsel informed the Court that they expended their war

---

[3]      This is not to imply that the Court rejects all of the Secretary's timeframes.  The Libertarian Party repeatedly represented that it was not challenging the June primary date provided by Maine law.  Moreover, in its earlier order, the Court set forth the deadlines the Secretary must meet in order to assure that military serving overseas and United States citizens living abroad receive ballots in accordance with the law in time to vote.  *Order on Mot. for Prelim. Inj.* at 24-26.

[4]      The Court is unpersuaded by the Defendants' citation of *Diamond*.  In *Diamond*, the First Circuit addressed Maine's election scheme, holding in part that it was not unconstitutionally burdensome on aspiring parties:

> [A] party which chooses not to participate in primary elections as a "qualified" party retains the option to qualify candidates for the statewide election ballot through the § 351 "nomination petition" procedure.  The Party has offered no evidence whatever to suggest that this alternate route to the printed ballot is substantially more burdensome for a small party than a primary-qualification procedure.

*Id.* at 373 (footnote omitted).  Having found a severe burden placed upon the Plaintiffs by the early deadline, an issue unaddressed by *Diamond*, the Court does not find that decision's burden analysis convincing with respect to its own irreparable harm analysis.  The Court further notes that the above language offers a route whereby a party "chooses not to participate" as a qualified party, *id.*, whereas the Plaintiffs' very objective in this case is to achieve party recognition.

28

chest on party qualification and lack the funds to petition. *Min. Entry* (ECF No. 36). Regardless, the Court has found a likelihood of success on the merits, meaning the Plaintiffs likely suffered deprivation of their associational rights, and "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 374-75 (1976) (plurality opinion) (citation omitted).

On the equities, the Court weighs the Plaintiffs' irreparable harm against the harm to the Defendants. If the Court were to order Libertarians re-enrolled, the Defendants raise concerns about harm to voters' choice and—as a corollary—to their own processes, as the Secretary may need to send and receive notices about re-enrollment. *Defs.' Resp.* at 4-5. They also worry about municipal registrars' ability to accept new enrollments during a busy electoral season. *Id.* While these hardships are not insubstantial, they do not outweigh the irreparable constitutional harm done by closing off the Plaintiffs' opportunity to become a recognized party, especially when the general election is still nearly six months away. And, importantly, the Court is able to shape relief so as to soften the edges of the Defendants' hardship.

Finally, it is axiomatic that the public interest favors the protection of constitutional rights. At the same time, the public has an interest in the orderly administration of elections; as the Court stated in its earlier order, when it was under the impression that the Plaintiffs sought participation in the primary election, it cannot grant relief that "would send the Maine primary election into chaos." *Order*

at 26.  As with the hardships, however, the Court believes relief can be shaped to ensure orderly elections consistent with the public interest.

## IV.    REVIEW OF RELIEF REQUESTED AND ORDER

At the May 16, 2016 hearing, the Plaintiffs' counsel said that the Libertarian Party of Maine nominated two candidates for the U.S. House of Representatives and one candidate for the Maine Senate at its state convention on May 15, 2016 in Lewiston, Maine.  *Min. Entry* (ECF No. 36).  They request injunctive relief placing these three candidates, along with the Libertarian Party's presidential and vice-presidential candidates, who will be selected at the national convention held May 27-30, 2016 in Orlando, Florida, on the general election ballot.  *Id.*  Any such relief would be contingent on the Libertarian Party of Maine meeting the 5,000-voter threshold, and the Plaintiffs ask for forty-five days from the date of the Court's ruling to meet the threshold and file a declaration with the Secretary.  *Pls.' Mot.* at 6; *Pls.' Reply II* at 6.  The Defendants stress that re-instating Libertarians or enrolling new Libertarians would unfairly burden the municipal registrars and the Secretary in ways that could jeopardize the orderly administration of the election.  *Defs.' Resp.* at 4-6.  They also cast the Plaintiffs' proposal as a request "to re-write Maine election law to fashion an entirely separate legal process unique to the Libertarian Party," allowing them to bypass such statutory requirements as holding municipal caucuses and nominating candidates through the primary election.  *Id.* at 6 (citing 21-A M.R.S. §§ 303(4), 331(1)).

With the parties' positions in focus, the Court fashions relief in view of the approaching general election on November 8, 2016.  It charts a path that enables the Plaintiffs to achieve party status and gain ballot access without unduly burdening the municipal registrars and the Secretary.  In so doing, the Court remains mindful that "implicit in the court's discretion under Rule 65(a) is that the court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case or may enter conditional preliminary relief."  11A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2947 (3d ed. 2013); *see also Willey v. Petit*, No. CIV. 85-0295-B, 1986 WL 22195, at *2, 1986 U.S. Dist. LEXIS 29459, at *6-7 (D. Me. Feb. 10, 1986) (quoting Wright & Miller § 2947).  Further, there is District of Maine precedent for refusing to enforce election-law deadlines that have been found unconstitutionally early. *Stoddard*, 593 F. Supp. at 309 (enjoining Secretary from enforcing an unconstitutional deadline with regard to plaintiff, an independent candidate for U.S. Senate); *Anderson v. Quinn*, 495 F. Supp. 730, 734 (D. Me. 1980) (same for an independent presidential candidate).  When pressed at the May 16, 2016 hearing, the parties were candid; the Plaintiffs admitted that their chief concern is with the presidential election, and the Defendants conceded that granting credit for previous enrollments, reopening enrollments, and placing presidential and vice presidential candidates in the manner of other recognized parties on the general election ballot would be workable.[5]  *Min. Entry* (ECF No. 36).

---

[5]    At the hearing, the Defendants also noted that among the requirements for continued qualification as a state-recognized party after the November 8, 2016 general election is that at least

31

Thus, the Court orders the Defendants to give the Plaintiffs credit for, but not to re-enroll, the 4,513 Libertarians who lost their party membership when the Secretary determined that the Libertarian Party failed to qualify under Maine law. Credit is preferable to re-enrollment because (1) it imposes a lesser burden on the Secretary and (2) it obviates the problems raised by past Libertarian enrollees who may have subsequently enrolled in another political party. The Plaintiffs have until July 12, 2016 to make up the balance of enrollments—specifically, 487—needed to meet the 5,000-voter threshold. The Secretary is to inform the municipal registrars to accept new Libertarian Party enrollments, along with the proviso that none of the newly enrolled Libertarians can be previously enrolled Libertarians for whom the Libertarian Party is already receiving credit; in other words, there can be no double-counting. If the Plaintiffs succeed in qualifying as a party within the extended period, they will be entitled to certify their presidential and vice-presidential candidates to the Secretary in the manner of other qualified parties.

The Court will not order the Defendants to place the Plaintiffs' three other candidates—two for U.S. Congress, one for state Senate—on the general election ballot, regardless of whether they ultimately succeed in qualifying as a party. To do so would exempt the Plaintiffs from the municipal caucus and primary election requirements. 21-A M.R.S. §§ 303(4), 331(1). The Defendants assert, and the Plaintiffs concede, that there is a valid state interest in requiring any candidate to

---

10,000 of enrolled Libertarians vote in the general election. 21-A M.R.S. § 301(1)(E) ("A party qualifies to participate in a primary election if its designation was listed on the ballot of either of the 2 preceding general elections and if: . . . At least 10,000 voters enrolled in the party voted in the last general election").

demonstrate a basic level of support.  This interest applies not only to support in the state as a whole, but also to support in voting districts within the state.

As the First Circuit has written, "[t]he Supreme Court recently confirmed that a State possesses a *separate,* and *additional,* interest in ascertaining that a political party which nominates candidates for office in an electoral subdivision of a larger political unit demonstrate support in the *particular electoral subdivision* for which the candidate is nominated." *Diamond*, 992 F.2d at 372 (emphasis in original) (citing *Norman*, 502 U.S. at 294).  So, while the equities call for a remedy that treats the Plaintiffs—should they achieve party status—like other political parties to the extent practicable, the equities do not justify allowing the Plaintiffs to bypass requirements that protect important state interests, especially when doing so would impose concomitant burdens on the Secretary's election preparations.

## V.    CONCLUSION

The Court GRANTS the Plaintiffs' Emergency Motion for Reconsideration (ECF No. 32).  The Court GRANTS in part and DENIES in part Plaintiffs' Emergency Motion for a Preliminary Injunction (ECF No. 8) in keeping with the above order.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of May, 2016